**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LAUREATE EDUCATION, INC.,

                Plaintiff,

      v.

THE INSURANCE COMPANY OF THE STATE

OF PENNSYLVANNIA,

                Defendant.

11 Civ. 7175 (CRK)[1]
OPINION AND ORDER

# INTRODUCTION

CLAIRE R. KELLY, District Judge:

    This insurance dispute arises out of massive earthquakes that struck Chile and Mexico on February 27, 2010 and April 4, 2010, respectively. Plaintiff, Laureate Education, Inc. ("Laureate" or "Plaintiff"), a global provider of education, headquartered in Baltimore, Maryland, with facilities all over the world, suffered damage to several of its locations as a result of these earthquakes. Defendant, The Insurance Company of the

---

[1] Judge Claire R. Kelly of the United States Court of International Trade, sitting by designation.

State of Pennsylvania ("ICSOP" or "Defendant"), insured Plaintiff's various locations against property damage and business interruption ("BI" or "business interruption") for covered perils, including earthquakes. The policy at issue is an Inland Marine Basic Policy (the "Policy") covering the period September 30, 2009 to September 30, 2010.

Plaintiff was represented by its insurance broker, Aon Risk Services, Inc. ("Aon"), in its 2009-2010 Policy renewal with Defendant. Aon provided Plaintiff with a template to enter the values of its assets and business interruption. This document, referred to as the statement of values, was provided to Defendant at the time of renewal. Following the earthquakes, Plaintiff notified Defendant of its losses and the parties began the claim adjustment process. Defendant designated Charles Taylor adjusting ("CTa") to adjust Plaintiff's claim. CTa sent a team to tour the damaged locations and prepare reports. The parties each engaged forensic accountants to assist in valuing the claim.

The adjustment process broke down due to several disagreements regarding the interpretation of the Policy. For damage to property in Mexico, the parties dispute how to calculate the earthquake deductible. For damage to property in Chile, the parties each prepared initial estimates for Plaintiff's claim and thereafter Defendant advanced Plaintiff $5 million on an unallocated basis. However, problems in the adjustment process arose. First, the parties dispute the interpretation of the earthquake deductible. Second, the parties dispute coverage for the UNAB Autopista ("Autopista") location. This coverage issue arose in part because the statement of values for the 2009-2010 Policy renewal did not contain building values for that location, and identified the location as a leased location rather than an owned location. Third, the parties dispute whether Plaintiff can recover on an actual cash value ("ACV" or "actual cash value") basis as opposed to the costs Plaintiff

actually spent in repairing the Chilean properties.  After the earthquake, Plaintiff made quick repairs to its buildings so that it could reopen as soon as possible.  Defendant initially valued Plaintiff's property damage loss based on the "cost to replace" the buildings, but later, at Plaintiff's request, changed its computation to the ACV method. Finally, Plaintiff and Defendant agreed that contract professor salaries should be included in the claim, but now dispute whether those salaries should be included in the time element values portion of the deductible.

Unable to resolve the disputes discussed above, Plaintiff filed a complaint in the District Court for the Southern District of New York on October 21, 2011.  Plaintiff brings this action claiming that Defendant has failed to meet its obligations under the Policy.[2] See Pl.'s Compl. ¶¶ 47, 55, 62, 69, 76, Oct. 12, 2011, ECF No. 1.  Defendant asserts that it "has indemnified Laureate in full according to the terms, conditions and/or provisions of the Policy." Def.'s Answer ¶ 78, ¶¶ 46–79 Dec. 7, 2011, ECF No. 14.   After discovery closed, the parties filed these cross-motions.

## THE MOTIONS

The parties cross-move for summary judgment.   Plaintiff moves for partial summary judgment, stating that (i) the Policy's earthquake property damage deductible is to be calculated based on 5% of the cost of its property damage; (ii) the ACV

---

[2] In its complaint, Plaintiff asks for (1) a declaration that Defendant is obligated to "indemnify Laureate for real property losses at its Chile and Mexico locations subject only to a deductible of 5% of the amount of the physically damaged real property"; (2) a declaration that Defendant is obligated "to calculate business interruption losses without reference to contract employee payroll"; (3) a declaration that Defendant is obligated to "indemnify Laureate for its real property loss and BI loss at the Autopista Location in Conception, [sic] Chile"; (4) a declaration that Defendant is obligated to "indemnify Laureate for the actual cash value of its real property loss"; and (5) damages for breach of contract for Defendant's failure to "indemnify Laureate for all Loss up to the applicable limits of liability." Pl.'s Compl. ¶¶ 47, 55, 62, 69, 76.

methodology applies and under it Plaintiff is entitled to calculate "proper deduction for depreciation" in accordance with the Marshall & Swift methodology; (iii) the calculation of the time element portion of the earthquake deductible should exclude contract professors' salary amounts;[3] and (iv) Plaintiff is entitled to payment of its business interruption losses in connection with its Autopista location. See Pl.'s Mot. Summ. J. 2, June 27, 2013, ECF No. 59.   Defendant cross-moves for summary judgment on all Plaintiff's counts.  Def.'s Mot. Summ. J. 1, June 28, 2013, ECF No. 63.   Defendant states that (i) Plaintiff is only entitled to recover its actual incurred costs; (ii) the Autopista location in Chile was not covered at the inception of the Policy, was never agreed to, and, therefore, is not covered for either property damage or business interruption losses; (iii) the property damage portion of the earthquake deductible is calculated based on the property damage values at the time of loss; and (iv) Plaintiff's contract professors' salaries, which were included in Plaintiff's claim calculation are included in the time element value portion of the deductible calculation.  See id. at 1–2.

## DISCUSSION

### Standard of Review

The court will grant summary judgment when there is no genuine dispute as to any material facts entitling the moving party to judgment as a matter of law. See Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91

---

[3] In its complaint, Plaintiff asked for a declaration that Defendant is obligated "to calculate business interruption losses without reference to contract employee payroll." Pl.'s Compl. ¶ 55.  In its motion for summary judgment, it focuses not on the losses it sustained but on the values that it must report for purposes of establishing the deductible.  Pl.'s Mot. Part. Summ. J. 22.  While Plaintiff's articulation of its claim differs slightly, it is clear to the court that Plaintiff argues it should be indemnified for the cost of paying contract professors to work after the earthquake, but does not believe the value of contract professors' salaries are appropriately included in the time element values portion of the earthquake deductible.

4

L.Ed.2d 265 (1986).  The court will first determine the material facts necessary to the elements of each claim and then determine whether there is a genuine dispute as to any of those facts.  See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 805–06, 119 S.Ct. 1597, 1603, 143 L.Ed.2d 966 (1999).  A material fact is one that would "affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A dispute "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

The moving-party bears the initial burden of demonstrating the absence of a genuine dispute of fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).  See also Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 255.  Only when the moving party satisfies this burden is the non-movant obligated to respond.  Celotex Corp., 477 U.S. at 322, 106 S.Ct. at 2552.  Thereafter, the burden shifts to the non-movant to present evidence showing that there are indeed facts in dispute.  See Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).  In order to defeat a motion for summary judgment "where the non-moving party will bear the burden of proof at trial on a dispositive issue," the non-movant must "designate specific facts showing that there is a genuine issue for trial," with evidence that goes beyond the pleadings.  Celotex Corp., 477 U.S. at 324, 106 S.Ct. at 2553 (internal quotation marks omitted).

On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S.

at 255, 106 S.Ct. at 2513 (<u>citing</u> <u>Adickes</u>, 398 U.S. at 158–59, 90 S.Ct. at 1608–09). However, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus.</u>, 475 U.S. at 586, 106 S.Ct. at 1356 (citations omitted).  Furthermore, in considering whether the non-movant has adduced enough evidence to defeat a motion for summary judgment, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir.1998) (citations omitted). <u>See also</u> <u>F.D.I.C. v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010).  When it is clear that no rational fact-finder "could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and" the court should grant summary judgment. <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994) (citation omitted). <u>See also</u> <u>Great Am. Ins. Co.</u>, 607 F.3d at 292 (citation omitted); <u>Brown v. Eli Lilly & Co.</u>, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted).

**Choice of Law**

The parties failed to designate a choice of law in the Policy.  A federal court sitting in diversity jurisdiction will apply the forum state's choice of law rules to "determine the body of substantive law that applies" to the insurance policy. <u>Schwartz v. Liberty Mut. Ins. Co.</u>, 539 F.3d 135, 151 (2d Cir. 2008) (<u>quoting</u> <u>Booking v. Gen. Star Mgmt. Co.</u>, 254 F.3d 414, 419 (2d Cir. 2001) (<u>citing</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 497, 61 S. Ct. 1020, 1022, 85 L.Ed. 1477 (1941))) (internal quotation marks omitted). Under these rules, "'[t]he first step . . . is to determine whether there is an 'actual conflict' between the laws of the jurisdictions involved.'" <u>Booking</u>, 254 F.3d at 419 (<u>quoting</u> <u>In re</u>

Allstate Ins. Co., 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (N.Y. 1993)).  Where no conflict exists and "New York law is among the relevant choices, New York courts are free to apply it."  International Bus. Mach. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) (citations omitted).

Here, there is an actual conflict.  Maryland courts construe insurance policies like other contracts.  See JMP Associates, Inc. v. St. Paul Fire & Marine Ins. Co., 345 Md. 630, 635, 693 A.2d 832, 834 (Md. 1997) (quoting Bond v. Pennsylvania Nat'l Mut. Casualty Ins. Co., 289 Md. 379, 384, 424 A.2d 765, 768 (Md. 1981) (citations omitted)). The "court interpreting an insurance policy is to examine the instrument as a whole, focusing on the character, purpose, and circumstances surrounding the execution of the contract."  JMP Associates, 345 Md. at 635, 693 A.2d at 834 (citing Pacific Indem. Co. v. Interstate Fire & Casualty Co., 302 Md. 383, 388, 488 A.2d 486, 488 (1985)).  Words are accorded their "ordinary and accepted meanings," determined by the "meaning a reasonably prudent layperson would attach to the term."  JMP Associates, 345 Md. at 635, 693 A.2d at 834.  While similarities between Maryland and New York abound, the New York Court of Appeals and the Second Circuit agree that insurance policies "should be read in light of common speech and the reasonable expectations of a businessperson." Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006) (quoting Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co., 13 A.D.3d 599, 788 N.Y.S.2d 142, 144 (N.Y. App. Div. 2004) (citations omitted)); see also VAM Check Cashing Corp. v. Federal Ins. Co., 699 F.3d 727, 728 (2d Cir. 2012) ("Under New York insurance law, the plain language of an insurance policy, read 'in light of common speech and the reasonable expectations of a businessperson' will govern if the language is

unambiguous." (quoting Belt Painting Corp. v. TIG Ins. Co., 100 N.Y.2d 377, 383, 763 N.Y.S.2d 790, 792, 795 N.E.2d 15, 17 (N.Y. 2003) (citations omitted) (internal quotation marks omitted)).  This actual conflict, interpreting insurance policies in light of common speech and the reasonable expectations of the ordinary businessperson, or in light of the meaning a reasonably prudent layperson would attach to a term, requires a choice.  See Schwartz, 539 F.3d at 151.

For contract cases, "New York applies the 'center of gravity' or 'grouping of contacts' theory of conflict of laws."  Maryland Cas. Co. v. Continental Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003) (citing Auten v. Auten, 308 N.Y. 155, 160, 124 N.E.2d 99, 101 (N.Y. 1954)).  Stated differently, "New York courts apply 'the law of the place which has the most significant contact with the matter in dispute.'"  Maryland Cas. Co., 332 F.3d at 151 (citing Auten, 308 N.Y. at 160, 214 N.E.2d at 102).  "The purpose of grouping contacts is to establish which State has 'the most significant relationship to the transaction and the parties.'"  Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 612, 618 N.E.2d 1065, 1068 (1994) (quoting Restatement (Second) of Conflicts of Laws § 188 (1971)).  In conducting this analysis, New York courts look to "the place of contracting" along with "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties."  Schwartz, 539 F.3d at 151–152 (quoting Zurich, 84 N.Y.2d at 317, 618 N.Y.S.2d at 612, 642 N.E.2d at 1068) (internal quotation marks omitted).  See also St. Paul Fire & Marine Ins. Co. v. Employers Reins. Corp., 919 F.Supp. 133, 136 (S.D.N.Y.1996).  Furthermore,

> [i]n the insurance law context, New York recognizes the precept that a court should apply "the local law of the state which the parties understood was to be the principal location of the insured risk . . . unless with respect to the

> particular issue, some other state has a more significant relationship . . . to
> the transaction and the parties."

_Schwartz_, 539 F.3d at 152 (quoting Restatement (Second) of Conflicts of Laws § 193

(1971)) (citing _Zurich_, 84 N.Y.2d at 318, 618 N.Y.S.2d at 613, 642 N.E.2d at 1069

(considering "what the parties understood to be the location of the risk")). On the other

hand, "[i]t is commonplace for courts applying New York choice-of-law rules to disregard

(or at least discount) the location of the insured risk when the risk is located in two or

more states." _Schwartz_, 539 F.3d at 152 (quoting _Maryland Cas. Co._, 332 F.3d at 153

(citations omitted)) (internal quotation marks omitted) (citing Restatement (Second) of

Conflicts of Laws § 193 cmt. b (1971)).

Applying the New York approach to this dispute the contract was "executed,

issued, and delivered in New York." Def. 56.1 Opp'n ¶ 27, Aug. 30, 2013, ECF No. 66.[4]

The Policy was at least partly negotiated in New York, although Defendant asserts that

"[k]ey provisions of the Policy were also negotiated in Maryland." Def. 56.1 Opp'n ¶ 26

(disputing in part Plaintiff's assertion that "[t]he Policy was placed, or negotiated, in New

York, by a New York broker (Aon) and ICSOP, a New York insurer."). Plaintiff's insurance

broker, Aon, is New York based, and brokered the Policy on Plaintiff's behalf.[5] Def. 56.1

---

[4] Citations to "Def. 56.1 Opp'n" refer to "Defendant's Opposition to Plaintiff's Rule 56.1 Statement." Unless otherwise noted, where this document is cited, Defendant does not dispute the fact asserted.

[5] Plaintiff disputes that the Policy was "negotiated." By separate motion, the Defendant objected to Plaintiff's proffer of an email excerpt relevant to the negotiation issue. Defendant requested "that the Court consider the complete email . . . as part of the record with respect to the Parties' cross motions for summary judgment in this case," or alternatively "request[ed] that the Court strike Exhibit B . . ." Def.'s Mot. to Strike 4, Sept. 20, 2013, ECF No. 79. At oral argument, the court questioned Plaintiff as to whether the entire email chain, rather than just the excerpt, could have been attached to one of Defendant's motions. Plaintiff responded: "They could have, they had three chances to do that and they didn't do it." Oral Arg. at 2:36:57, Feb. 20, 2014. Plaintiff further stated "they could have simply filed a motion to supplement the record . . . ." _Id._ at 2:38:22. A district court has broad discretion in determining the admissibility of evidence. _Lebewohl v. Heart Attack Grill LLC_, 890 F.Supp.2d 278, 298 (S.D.N.Y. 2012) (citing _Raskin v. Wyatt Co._, 125 F.3d 55, 65 (2d Cir. 1997)). Moreover, "[t]he principles governing admissibility of evidence do not change on a motion for summary judgment." _Raskin_, 125 F.3d at 66. Here, the complete email would be admissible at trial and is appropriate for the court to consider at summary judgment. Including the complete email chain

Opp'n ¶ 3. Premium invoices were forwarded to Aon in New York. Def. 56.1 Opp'n ¶ 28. Furthermore, while the insured's headquarters are in Maryland, the insurer is located in New York. Pl. 56.1 Response ¶ 2, Aug. 31, 2013, ECF No. 70.[6] Plaintiff also correctly notes, Defendant "adjusted the claim from New York and is likely to pay the remainder of Laureate's claims to Laureate from its New York offices." Pl.'s Mot. Part. Summ. J. 11. Additionally, even though the Policy does not contain a choice of law clause, it does contain a New York statute of limitations provision, as well as a provision requiring "that notice of all claims be provided to Aon in New York." Pl.'s Mot. Part. Summ. J. 11; Def. 56.1 Opp'n ¶ 25.

On a final note, the fact that Plaintiff operates and insures properties around the world, lends credence to the selection of New York law. Am. Home Assur. Co. v. Merck & Co. Inc., 329 F. Supp. 2d 436, 445 (S.D.N.Y. 2004) is instructive. There, the properties insured were located worldwide, the policy's only state-specific clause was a Pennsylvania statute of limitations provision, and the policy was issued in Pennsylvania. Am. Home Assur. Co., 329 F. Supp. 2d at 445. The court reasoned that "[g]iven the significance accorded to place of contract by New York's choice of law rules, and the absence of a specific geographical focus for the coverage itself, these details are determinative[ly]," in favor of Pennsylvania law. Am. Home Assur. Co., 329 F. Supp. 2d at 445. Thus, New York law governs.

---

also comports with the parties' stipulation to submit complete documents. See Zieden-Weber Decl. Def.'s Mot. to Strike Ex. 1, Sept. 20, 2013, ECF No. 78-1. Therefore, the court grants Defendant's motion to consider the entire email chain, CWS-Curtin00004576 to CWS-Curtin00004609, attached as Exhibit 4 to Defendant's Motion to Strike Exhibit B.

[6] Citations to "Pl. 56.1 Response" refer to "Plaintiff Laureate Education, Inc.'s Response to Defendant ICSOP's Statement of Material Facts in Support of Motion for Summary Judgment." Unless otherwise noted, where this document is cited, Plaintiff does not dispute the fact asserted.

**The Property Damage Deductible**

Plaintiff and Defendant each move for summary judgment on the interpretation of the property damage deductible.  Plaintiff claims that the court should interpret the phrase "five percent (5%) of total 100% property damage and time element values at the time of the loss per affected location(s)," Greeves Decl. Pl.'s Mot. Ex. A, at ¶ 6.A.(3), June 27, 2013, ECF No. 58-1; Zieden-Weber Decl. Def.'s Mot. Ex. 11, at ¶ 6.A.(3), June 28, 2013, ECF No. 62-16,[7] to mean that the deductible should be based on the cost of the actual property damage sustained, as well as the time element values at the time of the loss. Pl's Mot. Part. Summ. J. 14.   Defendant argues the same phrase means that the deductible is based on a percentage of the value of the property insured at the time of the loss, as well as the time element values at the time of the loss.  Def.'s Mot. Summ. J. 21. Because the deductible is formulated using a percentage, which, based on the context of the entire Policy, must necessarily be applied to a value, the court agrees with the Defendant that the Policy unambiguously requires the deductible to be based on property damage values.

The relevant portions of the Policy that relate to the deductible are set forth below. Paragraph 6.A.(3) provides: "[a]s respects the peril of earthquake or volcanic action, . . . a five percent (5%) of total 100% property damage and time element values at the time of the loss per affected location(s) deductible applies, subject to a minimum of $100,000 per occurrence deductible." Policy at ¶ 6.A.(3).  Endorsement 11, the Occurrence Limit of Liability Endorsement, provides at paragraph 2:

2. The premium for this policy is based upon the statement of values provided to the Insurer(s) by or on behalf of the Insured and kept on file by

---

[7] Hereinafter this document will be cited as "Policy" at the relevant paragraph(s), e.g., Policy at ¶ 6.A.(3).

the Insurer(s).   In the event of loss under the policy, the liability of the
Insurer(s) shall be limited to the least of the following:
    a) The actual adjusted amount of loss, less applicable deductible(s);
    b) As respects each location insured by this Policy, one hundred (100%)
    percent of the total combined stated values for all categories of covered
    property (e.g. building, contents) and other covered exposures (e.g.,
    business income, extra expense, rental loss) shown for that location on
    the latest statement of values or other documentation on file with the
    insurer.
    c) Any other Limit of Liability or Sublimit of Insurance or Amount of
    Insurance specifically stated in this policy to apply to any particular
    insured loss or coverage or location.

Policy at Endorsement 11.   Additionally, the statement of values contains a column

heading entitled "Total PD."  See Greeves Decl. Pl.'s Opp'n Ex. W, Aug. 31, 2013, ECF

No. 71-23.[8]

The parties dispute whether the court should consider the statement of values

when interpreting the clause at issue or whether the statement is extrinsic to the Policy.

Therefore, as an initial matter, the court must determine whether the statement of values

is incorporated by reference.

In New York, "'a paper referred to in a written instrument and sufficiently described

may be made a part of the instrument as if incorporated into the body of it.'" PaineWebber

Inc. v. Bybyk, 81 F.3d 1193, 1201 (2d Cir. 1996) (quoting Jones v. Cunard S.S. Co., 238

A.D. 172, 173, 263 N.Y.S. 769, 771 (N.Y. App. Div. 2d Dep't 1933) (citation omitted)).

New York requires "'that the paper to be incorporated into a written instrument by

reference must be so referred to and described in the instrument that the paper may be

identified beyond all reasonable doubt.'"  PaineWebber Inc., 81 F.3d at 1201 (quoting

Chiacchia v. National Westminster Bank USA, 124 A.D.2d 626, 628, 507 N.Y.S.2d 888,

---

[8] Hereinafter this document will be cited as "2009-2010 Renewal Statement of Values."

889–90 (N.Y. App. Div. 2d Dep't 1986)). "When a contract clearly identifies a single document, it eliminates all reasonable doubt and thus qualifies as an effective incorporation." Serrano v. Cablevision Sys. Corp., 863 F. Supp. 2d 157, 165 (E.D.N.Y. 2012) (citing Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 47 n.8 (2d Cir. 1993)). Endorsement 11 identifies the statement of values provided by the insured to the insurer beyond all reasonable doubt. Endorsement 11 references a statement of values twice:

> 2. The premium for this policy is based upon the statement of values provided to the Insurer(s) by or on behalf of the Insured and kept on file by the Insurer(s). In the event of loss under the policy, the liability of the Insurer(s) shall be limited to the least of the following:
> . . .
>
>> b) As respects each location insured by this Policy, one hundred (100%) percent of the total combined stated values for all categories of covered property (e.g. building, contents) and other covered exposures (e.g., business income, extra expense, rental loss) shown for that location on the latest statement of values or other documentation on file with the insurer.

Policy at Endorsement 11.

Plaintiff argues that Endorsement 11 references two different statements of values, and therefore, there can be no incorporation by reference because it is unclear which was referenced. Plaintiff's argument mischaracterizes Endorsement 11. Endorsement 11 clearly envisions a statement of values supplied, and subsequently updated, by the insured. The values on the statement of values are necessarily updated as the values of the insured's property change. However, it is clear that Endorsement 11 has incorporated the 2009-2010 renewal statement of values. Here, the reference to the statement of values is akin to the reference in McDermott v. Great American Alliance Ins. Co., No. 02 CV 607, 2005 WL 2437020 (N.D.N.Y. Sept. 30, 2005) where the court found that the

13

phrase "[a]s per Statement of Values on file" incorporated the Statement of Values. McDermott, 2005 WL 2437020, at *3.

Relying on PaineWebber, Plaintiff argues this reference is insufficient. There, the Second Circuit held that the eligibility limiting language of the National Association of Securities Dealers Code ("NASD") was not incorporated by reference into the parties' underlying agreement simply because the agreement allowed, but did not require, the parties to arbitrate any dispute before an NASD arbitration panel. PaineWebber, 81 F.3d at 1201. The court stated, "[i]n short, it cannot be that these parties formed the objective intent to incorporate any *one* body of rules into the agreement itself," and that PaineWebber had "not shown that the NASD Code (in particular) [was] incorporated into the Agreement 'beyond all reasonable doubt.'" PaineWebber, 81 F.3d at 1201 (citation omitted). The parties were free to arbitrate before the NASD and adopt its code, or choose another national securities exchange's arbitration panel with its own code. PaineWebber, 81 F.3d at 1201. In the instant case, unlike PaineWebber, there is no competing reference at issue. There are not multiple statements of values to which the parties may be referring. Even assuming that there were, similar to the language in McDermott, Endorsement 11 refers to the statement of values "provided to the Insurer(s) by or on behalf of the Insured and kept on file by the Insurer(s)," eliminating any uncertainty. It is "clear that the parties to the agreement had knowledge of and assented to the incorporated terms." PaineWebber, 81 F.3d at 1201 (quoting Lamb v. Emhart, 47 F.3d 551, 558 (2d Cir. 1995)). Thus, the Policy incorporates the 2009-2010 renewal statement of values.

14

The property damage deductible dispute centers on how to determine the first variable to which the 5% applies.  Not surprisingly, Plaintiff argues for an interpretation of this Policy language that leads to a smaller variable and Defendant argues for an interpretation that leads to a larger variable.  More specifically, Plaintiff argues that the Policy language unambiguously requires the property damage portion of the deductible be computed by multiplying the actual cost of property damage incurred by .05.  In Defendant's view, the property damage portion of the deductible is equal to 5% of Plaintiff's property damage values.

New York law requires that insurance policies "should be read in light of common speech and the reasonable expectations of a businessperson."  Parks Real Estate, 472 F.3d at 42.  Merely because the parties dispute the meaning of a term does not mean that an ambiguity exists.  The court must "begin with the terms of the contract itself to see if the intent of the parties can be gleaned without resort to extrinsic evidence."  Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 617 (2d Cir. 2001) (citation omitted).

The parties dispute whether "property damage" is a noun or an adjective—Defendant claims that it is an adjective that modifies the noun "values," while Plaintiff's interpretation would treat "property damage" as a noun.  The court finds that the phrase "property damage" is an adjective that modifies the noun "values."  Any reasonable businessperson would expect the phrase following "5%" to identify a number or value.  The sentence is a mathematical equation.  The deductible is determined by multiplying .05 by something.  That something must be a number.  The phrase "property damage," as a noun standing alone, fails to identify a number to which the 5% can be applied.  A percentage could be applied to a "property damage claim," a "property damage amount,"

15

or "property damage values."   The Plaintiff relies, in part, on the notion that the phrase "property damage" may, in a colloquial sense, mean or imply an amount of money that property damage will cost someone.[9]   However, in order for the court to sustain the Plaintiff's interpretation, the court would have to read the word "amount," "claim," or other similar word, into the policy after the phrase "property damage" so that the phrase would read: 5% of the property damage claim and 5% of the time element values at the time of the loss.   When interpreting an insurance policy, "courts may not by construction add or excise terms . . . under the guise of interpreting the writing." 10 Ellicot Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 125 (2d Cir. 2010) (quoting Vt. Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879, 775 N.Y.S.2d 765, 768 (2004) (citation omitted)) (internal quotation marks omitted).   Defendant's interpretation requires no additional words.   A reasonable businessperson reading the entire Policy would not interpret the clause as the Plaintiff does.   A reasonable businessperson would expect that the percentage would be applied to a number and, furthermore, would not strain to read another word into the sentence when the word "values" was already present.   Clearly, the entire phrase "property damage and time element" modifies the noun "values" as the conjunction "and" suggests.   Reading in the word "amount" or "claim" in order to interpret the clause as the Plaintiff argues makes no sense given the rest of the sentence when read in the context of the entire Policy.

Moreover, the phrase "total 100%" requires 5% of the combination of both the property damage and time element values.   "Total" tells the reader to combine "100%

---

[9] The word damage is defined as "1. Loss due to injury; injury or harm to person, property or reputation; hurt, harm." Webster's Third New International Dictionary, 571 (3d ed. 1993); Merriam-Webster Online Dictionary, http://unabridged.merriam-webster.com/unabridged/damage (last visited Mar. 27, 2014).

property damage and time element values." Further, if the phrase "property damage" was read as "property damage claim," rather than "property damage values," then the phrase "at the time of the loss" would be redundant.

Plaintiff does not offer a reasonable interpretation of the sentence when read as a whole. At oral argument, Plaintiff suggested that the proper way to read the sentence was: "5% x (total 100% property damage) + (time element values at the time of the loss per affected location)."[10] Plaintiff's proffered formula requires the court to read the phrase "property damage" as modified by both "total" and "100%." It is unclear to the court what "total" adds to "100%" or vice versa if both words modify only "property damage." Likewise, Plaintiff's version strains to make "at the time of the loss" refer only to "time element values," so that no redundancy is created. However, such a reading would limit the entire phrase "at the time of the loss per affected location" to time element values, creating another problem. Time element values would be calculated per affected location while property damage would not, a reading clearly contrary to the intent of the parties.

Finally, the statement of values incorporated by reference via Endorsement 11 makes clear that the phrase "property damage" refers to property damage values. This document, which is completed by the insured, requires that the insured submit its property damage values (the value of the property in question) to the insurer under the document's heading labeled "Total PD." Therefore, the statement of values makes it abundantly clear that the Policy contemplates use of the phrase "property damage" with reference to property damage values.

---

[10] See Oral Arg. at 2:43:06–2:43:24.

Plaintiff points to the windstorm deductible which immediately follows the earthquake deductible and argues that Defendant could have used the windstorm deductible language to implement the interpretation it seeks. The windstorm deductible provides "two percent (2%) of the Total Insured Values at each affected location, subject to a minimum of $100,000 per occurrence . . . ." Policy at ¶ 6.A.(4). Importantly though, the windstorm deductible is not determined at the time of loss. This difference may seem slight upon initial examination, but it is important. Because the insured submits values at the time of renewal for the windstorm deductible, that deductible is, and remains, a fixed number, known from the time of renewal. Therefore, the insured can simply submit a total insured value ("TIV") and that value will not change. Thus, the windstorm deductible makes clear that it is referring to the TIV heading listed on the statement of values. The deductible for earthquake damage is determined at the time of loss, and therefore, the values upon which it is based are re-determined at the time when the loss occurs. Thus, using the windstorm language for the earthquake deductible would, in fact, change the deductible's meaning.

Plaintiff also relies heavily on the New York doctrine of *contra proferentem*, a doctrine that may apply where the terms of the policy are ambiguous. Once a court concludes extrinsic evidence does not resolve an ambiguity, a court may apply other rules of contract construction, including the rule of *contra proferentem*, which generally provides that where an insurer drafts a policy any ambiguity in [the] ... policy should be resolved in favor of the insured." Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 276 (2d Cir. 2000) (quoting McCostis v. Home Ins. Co., 31 F.2d 110, 113 (2d Cir. 1994)) (internal quotation marks omitted). The Second Circuit has "made clear

that under New York law, courts should not resort to *confra proferentum* [sic] until after consideration of extrinsic evidence." International Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 88 n.7 (citing Morgan Stanley, 225 F.3d at 276). That doctrine has no place here, where the court can determine the unambiguous meaning of the terms.

In light of the clear meaning of the words of the Policy, the court rules as a matter of law for the Defendant on this issue.

**Time Element Portion of the Deductible**

Plaintiff and Defendant cross-move for summary judgment on the calculation of the time element portion of the earthquake deductible. Plaintiff argues the salaries for contract professors are not included in the time element values portion of the earthquake deductible because their contracts did not require the professors to be paid "in the event they were unable to teach as a result of an act of God or a force majeure." Pl.'s Mot. Part. Summ. J. 26. Further, Plaintiff argues it is the policyholder who makes the determination of which employees must necessarily continue in the event of a business shutdown. Defendant argues that if the salaries are part of the claim for loss, either as ordinary or nonordinary payroll, then they must be included in the values at risk, and thus, included in the deductible calculation. The court denies the cross-motions because there are genuine disputes of material fact as to whether the parties intended to include the salaries of Plaintiff's contract professors in the time element values for purposes of the deductible calculation.

The issue is whether the parties intended the phrase "time element values" in the earthquake deductible to include the salaries of contract professors. In relevant part, the earthquake deductible is equal to "five percent (5%) of total 100% . . . time element values

19

at the time of the loss . . . ." Policy at ¶ 6.A.(3).  However, the Policy provides no additional guidance for how to calculate the time element values portion of the deductible.  On the other hand, paragraph 9.B.(1)–(2) does explain Plaintiff's business interruption coverage and how a claim for loss would be calculated.[11]  Under paragraph 9.B.(2), Plaintiff's claim for business interruption losses includes the net profit Plaintiff would have earned but for the damage caused by the earthquake, plus all those expenses which must necessarily continue during the period of business interruption.  These expenses include not only fixed costs, such as the salaries for key employees, but, under this Policy, business interruption coverage also includes ordinary payroll to the extent that it must necessarily continue while the business is shut down.  The Policy also acknowledges that the insured may seek coverage for measures taken to reduce the amount of business interruption loss incurred by resuming operations.  See Policy at ¶ 9.B.(4).  Finally, the Policy extends coverage for any "expenses as are necessarily incurred for the purpose of reducing any loss under this policy . . . ."  Policy at ¶ 9.I.(2).

Although the parties both selectively refer to the Policy's business interruption coverage provision, the calculation of a deductible for an insurance policy need not be tied to the business interruption coverage provision, or any other portion of the Policy.

---

[11] Paragraph 9.B.(1) provides coverage for "[l]oss resulting from necessary interruption of, or interference with business conducted by the Insured and caused by loss, damage, or destruction by any of the perils covered herein during the term of this policy to real or personal property as covered by this policy." Paragraph 9.B.(2) states that if any business interruption

> loss occurs during the term of this policy it shall be adjusted on the basis of actual loss sustained by the Insured, consisting of the net profit which is thereby prevented from being earned and of all charges and expenses (including ordinary payroll), only to the extent that these must necessarily continue during the interruption of business and only to the extent to which such charges and expenses would have been earned had no loss occurred.

Ordinary payroll is defined by the Policy as "the entire payroll expense for all employees of the Insured except officers, executives, department managers, employees under contract, and other important employees." Policy at ¶ 9.B.(2).

For example, a deductible may simply be a flat dollar amount that the insured's claim must exceed before the insured can recover. Additionally, here, there are differences in the loss calculation and the deductible calculation. For example, business interruption coverage is to "be adjusted on the basis of actual loss sustained . . . ." Policy at ¶ 9.B.(2). The deductible, on the other hand, is to be calculated as 5% of "time element values at the time of the loss," Policy at ¶ 6.A.(3), or, in other words, is not based on the actual loss sustained. The Policy itself does not define "time element values" nor does it directly tie the deductible to the business interruption coverage provision.

Furthermore, the parties disagree on whether the business interruption coverage provision informs the deductible calculation. At oral argument, Plaintiff's attorney stressed that the business interruption coverage provision is not a proxy for the time element portion of the earthquake deductible.[12] In its papers, Plaintiff states that "'time element values' represent the hypothetical loss profit exposure for a 12-month period predicated on an orderly shutdown of an operation and what costs would **necessarily continue** during that 12 month period." Pl.'s Mot. Part. Summ. J. 24; see also Def. 56.1 Opp'n ¶ 52. Defendant, while not disagreeing with Plaintiff's characterization of what time element values represent, assumes that the loss calculation must include the same

---

[12] Plaintiff did back track off this position a little at oral argument:

> Pl.'s Attorney: The world is divided in half, continuing, non-continuing.

> Judge: So you are saying when I'm trying to get a handle on what the deductible is I should not concern myself so much with the language about the loss?

> Pl.'s Attorney: Right, or ordinary payroll. It's not that you throw it out the window, it just doesn't really inform the analysis. Whether somebody is an ordinary payroll or not doesn't answer the whole question. I mean certainly if a person is legally entitled to be paid during the shutdown, I'm sure the CEO is on that list, let's say, whether or not you have the policy language working in your favor or not is not really an issue that you're going to have to address.

Oral Arg. 5:57:46–5:58:28.

components as the deductible calculation.   A reasonably intelligent person having examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood could interpret the Policy in either of these ways.  See Morgan Stanley, 225 F.3d at 275.

Both parties have submitted extrinsic evidence from which a jury could draw different inferences regarding the intended calculation of the Policy's time element deductible.  For example, Defendant's witness, Mr. John Cace testified regarding the time element portion of the deductible as follows:

> Q: So when you're talking about time element values you were assuming that there is no resumption of business for 365 days, aren't you?
> A: Correct.
> Q: Why would you need to maintain business continuity if it is a hypothetical assumption that the business is shut down in an orderly fashion for a period of one year?
> A: Well, first it wouldn't be an orderly fashion because you just had a catastrophic event.  But the purpose of the insurance is to insure the assets that generate revenue for your business, okay?  Teachers are a special or skilled employee that is the foundation of a university.  They're the key employees, they're skilled, they're special.  So they are necessary to be insured for your business, that's what their exposure is, those key employees.

Greeves Decl. Pl.'s Mot. Ex. 12 at 101:16–102:10, June 27, 2013, ECF No. 58-30.  This testimony arguably shows that Mr. Cace implicitly connects the statement of values with business interruption coverage and with the time element values in the deductible calculation.  Both Mr. Glasser and Mr. Lux's testimony link business interruption coverage with the values reported to the company.[13]  However, Mr. Lux also testified that the loss

---

[13] Mr. Glasser testified:

> Q: To the extent that payroll is excluded from coverage, is the payroll included in the reported values to the insurance company?
> A: No.

22

calculation and the value calculation for the deductible are not necessarily identical because they do not take account of the same considerations.[14]

Thus, the extrinsic evidence points in two directions about whether the parties intended for the deductible to be calculated in reference to the same components that are described in the business interruption coverage provision, and which are further reflected in the statement of values. "If the court concludes that an insurance policy is ambiguous, then the burden shifts to the insurer to prove that its interpretation is correct: if extrinsic evidence is available but inconclusive, the burden shifts at the trial stage." Morgan Stanley, 225 F.3d at 276.

Moreover, even if "time element values" was defined through the business interruption coverage provision, there is conflicting evidence on whether the loss

---

Q: To the extent that ordinary payroll coverage is added back by endorsement, should the values that are reported include ordinary payroll amounts for that period of time?

A: Yes.

Zieden-Weber Decl. Def.'s Mot. Ex. 7 at 148–49, Jun. 28, 2013, ECF No. 62-12. Mr. Lux testified:

Q: And to the extent that you then add back coverage by endorsement for say 90 days, then you are going to add back 90 days of ordinary payroll coverage to the values, correct?

A: If you assume 90 days of ordinary payroll coverage, yes.

Zieden-Weber Decl. Def.'s Mot. Ex. 59 at 142–43:23–4, Jun. 28, 2013, ECF No. 62-76.

[14] At deposition, Mr. Lux testified on the treatment of the various different kinds of ordinary payroll expenses:

Q: Isn't it inconsistent to treat teachers' salaries as fixed for purposes of the loss calculation but variable for the purposes of the value calculation?

A: No.

Q: Why not?

A: Because, again, the values' calculation is an annual value. It's not meant to be a loss number. It's not meant to be a loss calculation. Loss calculation stands on its own, and any company can have expenses that would be considered variable in a 12-month calculation that would not necessarily be variable in a real loss situation.

Greeves Decl. Pl.'s Mot. Ex. 13 at 107:2–15, Jun. 27, 2013, ECF No. 58-31.

calculation included the salaries as a continuing expense or as a mitigation cost.  For

example, Mr. Glasser, Plaintiff's forensic accountant, testified:

> Q: So money paid to teachers or professors is treated as a fixed cost for
> purposes of the loss calculation; isn't that correct?
> A: No.
> Q: Why?
> A: Treated as a continuing cost; not a fixed cost.
> Q: It's treated as a continuing cost, a cost that must continue during the loss
> period; is that correct?
> A: No, costs that would continue to mitigate the loss; not must continue.  If
> they couldn't, if they didn't – if the teachers could not have generated
> revenue, they wouldn't have paid the teachers and wouldn't have gone
> forward, so I look at the professors' salaries as you're addressing as a
> mitigating cost necessary to create revenue to lower the exposure to the
> insurance company.

Greeves Decl. Pl.'s Opp'n Ex. CC at 31:4–24, Aug. 31, 2013, ECF No. 71-29. In response

to a question about whether there were any teachers' salaries backed out of the loss

calculation, he further testified:

> There are no amount of professor salaries backed out of the loss calculation
> because they taught their classes and mitigated the loss and Laureate was
> able to have revenue to offset what the loss that the insurance company
> would have had to have paid them if the teachers didn't teach.

Greeves Decl. Pl.'s Mot. Ex. 7 at 206:12–22, Jun. 27, 2013, ECF No. 58-25.  The expert

report of Mr. Cace comes to a different conclusion.  The report states in relevant part:

> In regard to the rate of gross profit calculation for the time element claim,
> the calculation between BDO and C Lewis & Company are very similar.
> With respect to the treatment of payroll, they are identical as both
> calculations classify teachers' salaries as fixed costs.
>
> The treatment of payroll for rate of gross profit can be in dispute as to
> whether it is fixed or variable. The key inquiry as to whether payroll is fixed
> or variable is whether the employee is a key employee and necessary to
> maintain business continuity with the resumption of business.  In our view,
> teachers are both skilled and necessary to maintain and run an institution
> of higher learning.  Thus, teachers' salaries are fixed expenses.

Zieden-Weber Decl. Def.'s Mot. Ex. 50 at 7, Jun. 28, 2013, ECF No. 62-67.

24

Moreover, the parties dispute whether the business interruption column on the statement of values even included the contract professors' salaries. Mr. Glasser testified that he "could [only] surmise that given the values that were in the policy, especially in Chile, that professors' salaries were not included because the numbers were just not high enough to have included professor salaries . . . ." Greeves Decl. Pl.'s Mot. Ex. 7 at 155:12–17, Jun. 27, 2013, ECF No. 58-25. The business interruption values are listed by location without any breakdown, so the statement of values does not help to resolve this dispute. In reference to what Plaintiff reported in the lump sum number listed in the business interruption column, Mr. James Kelly testified that

> [w]e tried to find out how they came up with that and nobody really knew . . . . I mean, the document that you provided, Simone was sending an email to Shaun just saying that it wasn't a sophisticated method behind the BI value calculation. Basically it was 25 percent of the revenues by campus.

Zieden-Weber Decl. Def.'s Opp'n Ex. 9 at 181–82, Aug. 30, 2013, ECF No. 67-9. Thus, even were the court to determine that the "time element values" portion of the deductible is calculated with the same components used in the business interruption coverage provision or in the statement of values, there are genuine disputes about the components for each.

Finally, Plaintiff argues that even if the court were to accept Defendant's argument that the deductible should be tied to the coverage provision, it would still be entitled to summary judgment. Plaintiff argues that the coverage provision hinges upon who must "necessarily continue" as an employee and that under Hawkinson Tread Tire Service Co. v. Indiana Lumbermens Mut. Ins. Co., 362 Mo. 823 (Mo. 1951), the insured determines this question. Plaintiff argues that the contract professors were not covered as employees who must "necessarily continue," but as mitigation expenses.

25

In Hawkinson, the appellate court affirmed the trial court's determination that the employee at issue was not an important employee whose salary was covered under the policy.  There, the insured's building was destroyed in a fire and the employee was retained on payroll to serve as a watchman over the destroyed building and later as a supervisor at the insured's new building.  The trial court's determination was based on the insured's president testifying that the employee would not have continued on the payroll during a shutdown of indefinite length.  Defendant points out that the appellate court was reviewing the trier of fact's conclusion and not the court's conclusion as a matter of law.  The court agrees that to the extent Hawkinson serves as persuasive authority for Plaintiff's position, the procedural posture greatly diminishes its value to this summary judgment motion.  Moreover, the issue before the court is whether these parties intended for contract professor salaries to be included in the deductible based on the language of the Policy.  Hawkinson does not say that the insured's determination of who is an important employee is the only consideration.

Aside from its legal argument, Plaintiff's extrinsic evidence as to whether the contract professor salaries should be excluded from the deductible calculation is contested, as discussed above.  Further, Defendant's assertion that the time element values portion of the deductible tracks the components in the business interruption coverage provision and the statement of values is contested by testimony.  See, e.g., Greeves Decl. Pl.'s Mot. Ex. 13 at 107:2–15 (Lux Dep.); Greeves Decl. Pl.'s Mot. Ex. 12 at 101:16—102:10 (Cace Dep.).  Finally, it is contested whether the statement of values even included the contract professors' salaries.  See, e.g., Zieden-Weber Decl. Def.'s Opp'n Ex. 9 at 181–82 (Kelly Dep.); Greeves Decl. Pl.'s Mot. Ex. 7 at 155:12–17 (Glasser

Dep.).  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255, 106 S.Ct. at 2513 (citing Adickes, 398 U.S. at 158–59, 90 S.Ct. at 1608–09). Thus, because "time element values" as that term is used in the earthquake deductible is ambiguous, and the parties present conflicting extrinsic evidence as to whether the contract professors' salaries should be included in the time element values for the deductible, the parties' cross-motions are denied.

### Coverage of the UNAB Autopista Location

Defendant moves for summary judgment claiming that the building values at Autopista are not covered under the Policy.  Def.'s Mot. Summ. J. 17.  Defendant asserts that "[t]he record is clear that representatives of ICSOP did not agree to provide coverage for the buildings at the location prior to the earthquake as required by the plain language of the Policy," entitling Defendant to summary judgment on this issue.  Id.  Plaintiff opposes Defendant's motion, arguing that the record is not clear that there was no agreement to provide coverage, and that, furthermore, under the Policy no agreement was needed. Pl.'s Opp'n 12, Aug. 31, 2013, ECF No. 69.

At the inception of the 2009-2010 Policy, the Autopista location was a listed location on the statement of values, although it was incorrectly described as "leased." See 2009-2010 Renewal Statement of Values; Pl. 56.1 Response ¶ 34.[15]  As a result, at the inception of the Policy, the buildings at Autopista while owned, were only listed as leased and did not have any insurable values. Pl. 56.1 Response ¶ 38.

---

[15] To determine what limits, if any, apply to coverage for the Autopista location, the court must consider the locations and properties owned and declared by the Plaintiff at the inception of the 2009-2010 Policy term.

Real property is covered under paragraph 9.A. of the Policy:

[A]ll real and personal property (including improvements and betterments) owned, used, or intended for use by the Insured, or hereafter constructed, erected, installed, or acquired as defined below.

Policy at ¶ 9.A.(1).

Other provisions also affect the scope of coverage. Paragraph 9.A. limits coverage for Newly Acquired Location(s) which "must be reported to the Company within ninety (90) days of acquisition and accepted by the Company; otherwise after ninety (90) days any unreported/unaccepted Newly Acquired Location(s) will be considered an Unnamed Location(s) and subject to the Unnamed Location sublimit." Policy at ¶ 9.A.(3). Further, paragraph 9.A.(10) of the Policy defines Unnamed Locations as "any location owned by the Insured but not reported to the Company, or not on the schedule of locations provided to the Company for underwriting purposes." Policy at ¶ 9.A.(10). Paragraph 9 must be read in conjunction with Endorsement 11 which provides that

the liability of the Insurer(s) shall be limited to the least of the following:

. . .

b) As respects each location insured by this Policy, one hundred (100%) percent of the total combined stated values for all categories of covered property (e.g. building, contents) and other covered exposures (e.g., business income, extra expense, rental loss) shown for that location on the latest statement of values or other documentation on file with the insurer.

Policy at Endorsement 11.

Finally, the Policy sublimits affect coverage as well. Unnamed/Unscheduled Locations are subject to a critical earthquake limitation. Paragraph 4 provides for a "$10,000,000 Per Occurrence Unnamed/Unscheduled Locations, but no coverage for critical earthquake . . . until the location/locations is/are declared, rated and agreed by the underwriter." Policy at ¶ 4. Likewise, the Errors & Omissions sublimit in paragraph 4

28

provides that for "Unintentional Errors & Omissions," there is "no coverage for critical earthquake . . . until the location/locations is/are declared, rated and agreed by the underwriter . . . ." Policy at ¶ 4.

Thus, while Plaintiff owned property that could be covered under paragraph 9.A. of the Policy, its failure to provide complete information regarding that property renders the buildings either an "Unnamed Location" under the terms of the Policy, or a named location for which building values were not furnished.[16]  If the former, the Unnamed Location sublimit restricts coverage in connection with property located in critical earthquake territories.  If the latter, the failure to properly identify the property would preclude coverage under Endorsement 11, i.e., the values were not "stated values . . . of covered property (e.g. building, contents) . . . shown for that location on the latest statement of values or other documentation on file with the insurer," unless the failure could be saved by the Errors or Omissions clause.[17]  Paragraph 28, the Errors or

---

[16] Deposition testimony reveals at least two different views of the term "location." Mr. Patrick Hagerty testified at one point that Newly Acquired Property and Newly Acquired Locations were, effectively, the same thing. Hagerty Dep. 97, Oct. 25, 2012. In fact, Mr. Hagerty stated that a "[l]ocation is the property that's newly-acquired." Id. at 98:14–15. Later on in that same deposition, Mr. Hagerty testified that the two phrases were not quite interchangeable. Id. at 108. Mr. Hagerty stated that Newly Acquired Property and Newly Acquired Locations were only the same to the extent that "the newly-acquired property is a new location to the policy. If it's new property at a location, it's newly-acquired property at that location." Id. The next day, Mr. Hagerty testified that "a location referred to the entire row of values listed for a particular address on the statement of values." Hagerty Dep. 116, Oct. 26, 2012. Mr. Hagerty testified further that "if there were another row that had that address, that would become that location. There's insureds that report a location that might be made up of two different buildings, but it's at the same location." Id.  For the purposes of these motions the definition does not matter. Using either definition, the buildings at Autopista would have had to have been declared, rated and agreed to have been covered because they would be either an "Unnamed Location," or a named location for which building values were not furnished, lacking coverage unless protected by the Errors or Omissions clause.

[17] Plaintiff argues that the buildings at the Autopista location should be covered under paragraph 9.A.(3), the Policy's Newly Acquired Location clause. Plaintiff argues that unlike the Newly Acquired Property sublimit, coverage for Newly Acquired Location(s) has no critical earthquake territory limitations. See Policy at ¶ 4, ¶ 9.A.(3). Newly Acquired Location(s) must merely be "reported to the Company within ninety (90) days of acquisition and accepted by the Company; otherwise, after ninety (90) days any unreported/unaccepted Newly Acquired Location(s) will be considered an Unnamed Location(s) and subject to the Unnamed Location sublimit." Policy at ¶ 9.A.(3). However, Plaintiff's argument ignores the undisputed fact that neither the location nor the property was acquired during the Policy term. Therefore,

29

Omissions clause, provides that "[t]his insurance shall not be prejudiced by any unintentional or inadvertent error or omission resulting in incorrect description of the interest, risk or property, provided notice is given to the company as soon as practicable, upon discovery." Policy at ¶ 28.

However, the Unintentional Errors & Omissions sublimit in this Policy also restricts coverage for errors and omissions in connection with property located in critical earthquake territories. Therefore, because the critical earthquake limitation applies in both the Unnamed Locations and Errors & Omissions sublimits in this case,[18] coverage can only be had if the property was declared, rated and agreed.

Under the terms of the Policy, the Autopista location is in a critical earthquake territory and, therefore, could not be covered unless it was declared, rated and agreed. While the term "critical" is not defined in the Policy, there can be no dispute of its meaning when read in the context of the entire Policy. In paragraph 4 (Limits of Insurance), the Policy sets forth a limit for "High Hazard Critical Earthquake Zones III/IV as more fully defined below . . . ." Policy at ¶ 4. Although the Policy does not define the precise phrase

_____

neither the Newly Acquired Location nor the Newly Acquired Property clause pertains to whether the Policy covers the Autopista location.

[18] Plaintiff argues that New York Insurance Law § 3426(e)(1) estops Defendant from denying coverage through the "critical earthquake, critical flood, or critical windstorm" language in the Errors & Omissions sublimit. This law provides that an insurance policy remains in full force and effect pursuant to the same terms, conditions and rates unless the insurer sends written notice to the insured of nonrenewal or conditions renewal upon certain changes. See N.Y. Ins. Law § 3426(e)(1)(B); see also Ops Gen. Counsel N.Y. Ins. Dep't No. 08-11-04 [Nov. 18, 2008]. Sub-section 3426(l)(1) makes § 3426 applicable to "to any policy issued or issued for delivery in this state covering risks with multi-state locations, where the insured is principally headquartered in this state or where the policy provides that this section, as a matter of choice of law, is to govern this policy in regard to such locations." N.Y. Ins. Law § 3426(l)(1). The notice requirements in N.Y. Ins. Law § 3426(e)(1) do not apply because Plaintiff is headquartered in Maryland, the Policy does not provide that this section as a matter of choice of law governs the Policy, and none of the covered risks are located in New York. Thus, Plaintiff's argument made pursuant to New York Insurance Law § 3426(e)(1) must fail.

"High Hazard Critical Earthquake Zones III/IV," paragraph 6 distinguishes between earthquakes subject to a special percentage deductible based on geographic location. Paragraph 6.A.(3) specifically enumerates which locations are considered part of the "Earthquake or Volcanic Action III/IV Territories." Chile is one of the listed locations. Policy at ¶ 6.A.(3). Furthermore, Endorsement 20 to the Policy states that for the 2009-2010 renewal, the phrase "High Hazard Critical Earthquake Zones III/IV" was replaced by the same terminology used in paragraph 6 of the deductible, "Earthquake or Volcanic Action III/IV Territories." Policy at Endorsement 20. As such, the list of places in the "Earthquake or Volcanic Action III/IV Territories," section are the same for those in the "High Hazard Critical Earthquake Zones III/IV." A reasonable businessperson would interpret the word "critical" as referring to earthquake territories in "High Hazard Critical Earthquake Zones," which, by virtue of Endorsement 20, is defined by "Earthquake or Volcanic Action III/IV Territories." Therefore, there can be no serious dispute that Chile is a critical earthquake location subjected to critical earthquake sublimits under the Policy.

Plaintiff offers no interpretation of "critical" which furthers its cause. Plaintiff simply argues that the word "critical" is ambiguous and should be read out of the Policy. However, the court must construe the Policy to give meaning to every word therein. Fed. Ins. Co. v. Int'l Bus. Machines Corp., 18 N.Y.3d 642, 646, 965 N.E.2d 934, 936 (N.Y. 2012) (citations omitted); Consol. Edison Co. of New York, Inc. v. Allstate Ins. Co., 98 N.Y.2d 208, 221–222, 774 N.E.2d 687, 693 (N.Y. 2002) (citations omitted).

Defendant argues that there is no genuine dispute that this property was not declared, rated and agreed. Plaintiff, who has not moved for summary judgment on this issue, contends that whether the property has been declared, rated and agreed is a

disputed question of fact.  Plaintiff, as the non-movant is entitled to have all "justifiable inferences . . . drawn in his favor."  Anderson, 477 U.S. at 255, 106 S.Ct. at 2513 (citing Adickes, 398 U.S. at 158–59, 90 S.Ct. at 1608–09).  Yet, Plaintiff cannot point to any evidence (from which to draw inferences) that Defendant "agreed" to cover the property.  While there may be a dispute as to whether the buildings were declared and rated,[19] the only evidence relied on by the Plaintiff with respect to whether the Defendant agreed is a July 2009 email chain and a February 22, 2010 "Order to Include," stamped received by Chartis Chile.[20]   In the 2009 email chain, the first email, dated June 21, 2009, from Mr. Devin Ward to Mr. Patrick Hagerty, requested that Mr. Hagerty "work on advising on an AP that is applicable to these locations . . . ."[21]  Greeves Decl. Pl.'s Opp'n Ex. B at 3, Aug. 31, 2013, ECF No. 71-2.  This request was for coverage during the 2008-2009 policy term.  After emails discussing the effective date of the change, Mr. Hagerty informed Mr. Ward that:

> My B&M people have waived the AP, I am waiting to hear back from my reinsurance on the primary $25M to confirm their acceptance.  In the meantime, I will need confirmation from all RI'ers on the panels (for EQ and policy limit) of acceptance for no AP.  I will request this through Mike and John.  Also, will need confirm of no known losses at these new locations prior to acceptance to add them to our schedule.

The record before the court reveals no further communication about the locations discussed in this email chain, which ends on July 30, 2009.  At oral argument, Plaintiff conceded that the matter was dropped because the parties turned their attention to the

---

[19] See Greeves Decl. Pl.'s Opp'n Ex. C at 98:18–23, Aug. 31, 2013, ECF No. 71-3.  See also Greeves Decl. Pl.'s Opp'n Ex. V, Aug. 31, 2013, ECF No. 71-22.

[20] Chartis Chile appears to be a local division of Chartis, Inc., a related company of ICSOP.  See Def.'s Mot. Summ. J. 6; Pl. 56.1 Response ¶ 4.

[21] "AP" means "additional premium."  See Zieden-Weber Decl. Def.'s Mot. Ex. 3 at 218:3–4, June 28, 2013, ECF No. 62-6.

Policy renewal.[22]   Unfortunately for Plaintiff, when the Policy renewal occurred the property was incorrectly listed as leased with no accompanying building values.  Thus, the last communication before the September renewal contemplates further action as a condition precedent to agreement.   Plaintiff does not offer any evidence by which a reasonable juror could conclude that Defendant later acquiesced, either explicitly or by conduct.

Although the February 22, 2010 Order may provide some evidence that the buildings at Autopista were declared and possibly rated, there is no evidence on the record to support the conclusion that the Order represents an agreement by the Defendant to provide coverage.  Defendant argues that this Order provides no foundation for any agreement.  Defendant states that while it may have acknowledged receipt of the Order prior to the earthquake, its acknowledgment did not constitute agreement to provide coverage.  Def.'s Mot. Summ. J. 19.  Plaintiff did not respond on these grounds in its papers, and failed to provide the court with any legal theory at oral argument.  Plaintiff fails to point the court to any evidence in the record that could support an argument that the Order or the surrounding events constituted agreement, and the court can find none. As such, no reasonable jury could find that the Order indicates an agreement was reached.

Thus, it is undeniable that there is no evidence from which a reasonable jury could infer agreement to add the buildings to the 2009-2010 Policy.  Even if one could impute an agreement in 2008-2009 to the 2009-2010 Policy term, there is no evidence of an

---

[22] "Now that ended, that process ended. We don't know why it ended or how it ended. But it didn't result in the Autopista location having a real property value on the schedule of values." Oral Arg. 5:12:33–5:12:49.

agreement in that time frame either.  As a result, Defendant is entitled to summary judgment on this issue.

### Coverage of the Business Interruption Losses at Autopista

Both Plaintiff and Defendant move for summary judgment on the issue of coverage for Plaintiff's business interruption losses at the Autopista location.  Defendant claims that because the buildings at Autopista were not covered, there was no covered property damage, and, thus, there can be no coverage for business interruption losses at Autopista.[23]  Plaintiff claims that even if the property is not covered, Plaintiff still has an insurable interest under the Policy and that New York law recognizes business interruption losses for insurable interests. Because Plaintiff reported business interruption values for the Autopista location, and because Plaintiff "uses" the buildings at the Autopista location to generate its revenue stream, Plaintiff has an insurable interest under the Policy and is entitled to summary judgment on this issue.

Paragraph 9.B. of the Policy provides that business interruption coverage "only applies to those locations where Business Interruption values have been reported." Policy at ¶ 9.B.  The Policy further limits business interruption coverage to:

> Loss resulting from necessary interruption of, or interference with business conducted by the Insured and caused by loss, damage, or destruction by any of the perils covered herein during the term of this policy to real or personal property as covered by this policy.

Policy at ¶ 9.B.(1).  The Policy language restricts business interruption coverage to losses caused by damage to property "as covered by" the Policy.  Plaintiff's claim for losses stem

---

[23] Defendant states that even though Plaintiff had "an insurable interest in the UNAB Autopista buildings," Plaintiff chose to insure only the equipment and personal property at Autopista.  Def.'s Opp'n 23–24, Aug. 30, 2013, ECF No. 68.  Defendant claims that one may claim business interruption losses based on damage to personal property, but that Plaintiff's claim was not based on such a theory of loss.  Id. at 24.

34

from the damage caused by the destruction of the buildings at Autopista.  Pl.'s Reply 8 n.8, Sept. 16, 2013, ECF No. 75.  Therefore, under the terms of the Policy, Plaintiff would only be entitled to business interruption losses if the buildings at the location are a covered interest under the Policy.

The Plaintiff relies upon Zurich American Ins. Co. v. ABM Industries, Inc., 397 F.3d 158 (2d Cir. 2005) to argue that, under the terms of this Policy, New York law allows coverage for business interruption losses because Plaintiff has an insurable interest in the location.  In Zurich, "[t]he Second Circuit found . . . that the insured (a janitorial and maintenance company) had an insurable interest at the World Trade Center even though it did not own or lease, and had no coverage for property damage to, the buildings." Pl.'s Reply 8 (citing Zurich, 397 F.3d at 164–65).

In Zurich, the business interruption coverage provided for "loss resulting directly from the necessary interruption of business caused by direct physical loss or damage, not otherwise excluded, to insured property at an insured location." Zurich, 397 F.3d at 162 (internal quotation marks omitted).  Thus, the court found that the business interruption coverage was delineated by "the Insurable Interest provision, which define[d] the scope of coverage as '[t]he interest of the Insured in all real and personal property including but not limited to property owned, controlled, used, leased or intended for use by the Insured.'" Zurich, 397 F.3d at 165.  Construing this language, the court found that the insured did not need a "property interest" for business interruption coverage to apply, rather, the policy only required an "insurable interest," the outer boundaries of which the court defined with reference to the business in which the insured engaged. Zurich, 397 F.3d at 165. ("Because ABM did not 'own' or 'lease' the common areas and the premises

35

of the other tenants, whether they . . . 'used' or 'intended to use' these areas is the relevant inquiry."). Holding that the maintenance company had "used" (because as a janitorial company it cleaned and derived its income from) the common areas and the premises of the other tenants in the World Trade Center within the meaning of the policy, the Second Circuit granted summary judgment in favor of the insured.

Here, Plaintiff's business interruption coverage is similarly delineated by the real and personal property coverage provisions in paragraph 9 of the Policy. Under ¶ 9.A., Plaintiff has an insurable interest in "all real and personal property (including improvements and betterments) owned, used, or intended for use by the Insured, or hereafter constructed, erected, installed, or acquired as defined below." Policy ¶ 9.A.(1). Both the Zurich policy and Plaintiff's Policy cover any property "used" by the insured. In Zurich, the policy included coverage for "property owned, controlled, used, leased, or intended for use by the Insured." Zurich, 397 F.3d at 162 (internal quotation marks omitted). The Plaintiff's Policy includes coverage for property that is owned, used or intended for use. In Zurich, the plaintiff did not have any type of "legally cognizable" property interest in the destroyed buildings, although it used them in its efforts to generate an income stream. Based on the words "controlled," "used," and "intended for use," the court in Zurich determined that a legally cognizably interest in the property was not necessary for coverage. Instead, the court found that the plaintiff used the buildings in question as "the means by which [it] derived its income," thereby finding the plaintiff had an insurable interest in the use of the buildings under the policy. Zurich, 397 F.3d at 166–67. Here, Plaintiff reported the Autopista location as leased and used the buildings at Autopista to generate business.

36

Plaintiff has business interruption coverage for the Autopista location under the language of the Policy, despite the fact that Plaintiff did not report the buildings as owned on its statement of values. As a threshold matter, Plaintiff reported business interruption values, as required by the Policy language in 9.B., for the UNAB campus, of which the Autopista location was a part. Pl. 56.1 Response ¶ 37.[24] Therefore, the relevant inquiry is whether, like the plaintiff in Zurich, Plaintiff here had an insurable interest sufficient to provide it with business interruption coverage under 9.B., as that coverage is delineated by paragraph 9.A.(1). Paragraph 9.A.(1) provides coverage for the insured's interest in all real and personal property "used, or intended for use by the Insured" as did the policy in Zurich. As such, Plaintiff did not need to report the buildings as owned in order to obtain business interruption coverage under the Policy.

Plaintiff here has an even better argument for coverage than the plaintiff had in Zurich. In Zurich, the Second Circuit focused on the nature of the insured's business. The court stated, "[t]he existence and configuration of the common areas and tenants' premises were vital to the execution of ABM's business purpose." Zurich, 397 F.3d at 165–166. Further the court found that, "[t]hese areas and premises were the means by which ABM derived its income and were as essential to that function as ABM's cleaning tools." Zurich, 397 F.3d at 166. Tellingly, the court compared the plaintiff to an accounting firm, stating that "a reasonable person would not contest that a hypothetical accounting firm 'uses' the offices it occupies," finding that "it is the space or property that engenders productivity." Zurich, 397 F.3d at 166. Finally, the court analogized the plaintiff's use of

---

[24] Defendant acknowledges that "[n]o specific time element values were reported for the UNAB Autopista location, instead the column indicated that the values were, 'incl. above.'" Plaintiff disputes in part this characterization, asserting the notation, "incl. above" indicates the values for the Autopista location were included in the overall UNAB campus values. Pl 56.1 Response ¶ 37.

the property to other dictionary definitions of the word "use," including "having recourse to," and "enjoyment of" the property, as well as the broader concept of "putting the characteristics of the property into action and into its service." Zurich, 397 F.3d at 166 (citations omitted) (internal quotation marks omitted). Here, even more so than in Zurich, there can be no question that Plaintiff used the buildings in question. Like the accountant in Zurich, Plaintiff's income is generated through the use of the buildings at the Autopista location.

At oral argument, Defendant argued that the business interruption clause in Zurich is fundamentally different than in this case, and, therefore, the holding of Zurich does not apply.[25] Defendant points to Zurich's business interruption clause which provides for "loss resulting from the interruption of business caused by damage to insured property at an insured location." Zurich, 397 F.3d at 165. Defendant compares that clause to the language at issue here: "[l]oss resulting from necessary interruption of, or interference with business conducted by the Insured and caused by loss, damage, or destruction . . . to real or personal property as covered by this policy." Policy at ¶ 9.B.(1). Defendant argues that there is a meaningful difference between "to insured property at an insured location" and property "as covered by this policy." The court fails to see that difference. Both the phrase "insured property at an insured location" and property "as covered by this policy" point to the definition of the insured interest under their respective coverage clauses. See Zurich, 397 F.3d at 165 ("[t]he interest of the Insured in all real and personal property including but not limited to property owned, controlled, used, leased or intended for use by the Insured."). See also Policy at ¶ 9.A.(1) ("[A]ll real and personal property

---

[25] Oral Arg. at 4:45:52–4:47:08.

(including improvements and betterments) owned, used, or intended for use by the Insured, or hereafter constructed, erected, installed, or acquired as defined below."). However, both clauses acknowledge an insured's coverage for its use of property. Zurich holds that such a use is an insurable interest for which the insured is entitled to business interruption coverage. This court is bound by Zurich, and since the facts require, will follow it.

Defendant's counterargument that the claimed business interruption losses did not flow from covered property cannot withstand scrutiny. Paragraph 9 states that unless specific property is excluded from coverage, the insured's interest in "all real and personal property," whether that property is owned or used, is covered. Therefore, the issue is not whether Plaintiff submitted building values for the purpose of insuring those buildings in the event they suffered physical damage, but whether the business interruption losses flow from a type of real or personal property "as covered by the policy." Requiring that the loss stem from property "as covered by the policy" is not the same as requiring that the loss stem from property insured under the Policy.

**Valuation**

Defendant and Plaintiff each move for summary judgment on Count IV of Plaintiff's complaint, which seeks a declaratory judgment that Defendant is obligated to indemnify Plaintiff for the actual cash value of its real property loss. Defendant also moves on Count V of Plaintiff's Complaint, which seeks monetary damages Plaintiff incurred as a result of Defendant's breach of contract for failure to comply with its coverage obligations.[26]

---

[26] As Plaintiff only moves with respect to its claim for declaratory relief in Count IV, Plaintiff's motion for Partial Summary Judgment requests the court to interpret the language of the Policy and to declare Defendant's coverage obligations. See Pl.'s Mot. Part. Summ. J. 2. Defendant's motion seeks complete

Defendant argues it owes Plaintiff nothing because Plaintiff has not identified any admissible evidence "that supports either a replacement cost number or an ACV number that is higher than the actual cost to repair the property." See Def.'s Mot. Summ. J. 14. Finally, in response to Plaintiff's motion, Defendant contends that if Plaintiff establishes it is entitled to ACV, and has sufficient evidence to prove its damages at trial, the dispute would actually revolve around which of two depreciation approaches is more proper, which is a factual issue not suitable for summary judgment. Def.'s Opp'n 9, Aug. 30, 2013, ECF No. 68. Plaintiff argues that because its proposed depreciation method, the Marshall & Swift approach, is proper, it is entitled to summary judgment. Pl.'s Mot. Part. Summ. J. 21. In response to Defendant's motion, Plaintiff argues that Defendant has waived or should be estopped from arguing that Defendant should only have to pay for the actual repair costs. Further, Plaintiff argues that even without the benefit of waiver or estoppel, the Policy would allow Plaintiff to recover ACV. Pl.'s Opp'n 8. Finally, Plaintiff argues there is sufficient evidence that ACV is greater than $6.2 million. Pl.'s Opp'n 8-9.

The court concludes that Plaintiff is entitled to ACV as a matter of law based on the terms of the Policy. Further, because there is enough evidence to establish each component of the parties' agreed-upon methodology used to calculate actual cash value, there is sufficient evidence from which a reasonable jury could conclude that the actual cash value of Plaintiff's property is greater than $6.2 million. Therefore, the Defendant's motion for summary judgment on Plaintiff's Counts IV and V is denied. Additionally, the court finds that there are disputed facts as to whether the Marshall & Swift approach is a

---

summary judgment, and therefore also takes the view that Plaintiff cannot prove its monetary damages at trial, a required element in a breach of contract claim. Def.'s Mot. Summ. J. 1–2.

proper method of depreciation. Thus, Plaintiff's motion for summary judgment on the proper depreciation methodology is also denied.

Defendant argues that it need only compensate Plaintiff for the actual repair costs under the language of the Policy. Defendant further claims that Plaintiff's actual repair costs are limited to either "the cost to repair, rebuild or replace on the same site with new materials of like kind and quality *or* the actual expenditures incurred in repairing or rebuilding, *whichever is smallest.*" Def.'s Opp'n 9. In response, Plaintiff argues that Defendant has waived or should be estopped from claiming that Defendant's liability is limited to the actual repair costs and that the Policy requires Defendant to pay ACV.

The Policy provides that in the event the insured chooses to repair, the property will be valued as "the amount actually expended by or in [sic] behalf of the Insured to repair, rebuild or replace . . . ." Policy at ¶ 13.A. However, the insurer's liability is not to exceed the smallest of either "[t]he costs to repair, rebuild or replace on the same site with new materials of like kind and quality, whichever is the smallest," or "[t]he actual expenditures incurred in repairing, rebuilding or replacing on the same or another site within the same country, whichever is the smallest." Policy at ¶ 13.A. However,

> [i]n the event of loss or damage to such property that is not repaired, rebuilt or replaced, the basis of recovery shall be the actual cash value of the property at the time of loss with proper deduction for depreciation, and shall in no event exceed what it would then cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss.

Policy at ¶ 13.A. Therefore, if the insured chooses to repair, it is limited to the amount actually expended, not to exceed the cost to repair with material of like kind and quality. If the insured does not repair, its recovery is limited to the actual cash value, i.e., a repair

or replacement cost that contemplates the use of materials that would have been of like kind and quality, less depreciation.

The question for the court is what the Policy provides when the insured repairs its property, but not with material of like kind and quality, as is the undisputed case here. The Policy provides for reimbursement of actual costs and clearly envisions that the insured has a right to be reimbursed to restore its property to its previous condition as it existed prior to the damage caused by the peril. The Policy clearly allows the insured to choose not to repair and then to receive ACV. The Policy also envisions that the insured will mitigate damages.[27]  Logically, the Policy must therefore allow the insured to recover either: the repair costs incurred, using materials of like kind and quality, to restore the property to its pre-damage condition; or, the ACV of its property if the insured either does not repair at all, or does not restore its property to a pre-damaged condition. Any other reading would discourage mitigation which is specifically contemplated by the Policy.

As such, if the damaged property is not repaired to its previous condition as it existed prior to the damage-causing event, the insured is allowed to recover ACV: at a maximum, the hypothetical cost to repair or replace, using materials of like kind and quality, less depreciation. Because it is undisputed that Plaintiff only performed a quick patch-job in order to reopen expeditiously and did not fully restore its damaged properties to the same conditions they had been in prior to the earthquakes, see Def. 56.1 Opp'n ¶

---

[27] Paragraph 15 of the Policy requires the insured to "use due diligence and do and concur in doing all things reasonably practicable to avoid or diminish any loss of or damage to the property herein insured." Policy at ¶ 15. In addition, paragraphs 9.B.(4) and 9.I.(2) of the Policy state that any expenses incurred by the insured to reduce its loss of income will be taken into account in adjusting the insured's business interruption claim and that those expenses to reduce loss are covered under the Policy. See Policy at ¶¶ 9.B.(4), 9.I.(2).

17, the court finds as a matter of law that Plaintiff is entitled to recover under the ACV method.

The Defendant argues that even if Plaintiff were entitled to ACV, summary judgment would still be proper for the Defendant because Plaintiff can point to no evidence that establishes a replacement cost resulting in an ACV greater than $6.2 million. Defendant claims that Plaintiff "does not provide any evidence that ICSOP's payments to date fail to compensate it for its covered property damage . . . on an ACV basis." Def.'s Mot. Summ. J. 16. These arguments focus on Plaintiff's breach of contract claim, ignoring to a certain extent Plaintiff's request for declaratory relief. Plaintiff's Count IV was made pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act, which "by its express terms, vests a district court with discretion to exercise jurisdiction over a declaratory action . . . ." Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).[28] Thus, lack of sufficient evidence to prove damages does not resolve Count IV of the complaint where the scope of coverage is concerned. See Duane Reade, 411 F.3d at 389 (agreeing that the district court had jurisdiction over questions about the scope of coverage). A separate question remains of whether, as a matter of law, Plaintiff has failed to put forth any evidence that it is entitled to damages.

Under Fed. R. Civ. P. 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party must support its motion for summary judgment

---

[28] In Duane Reade, the Second Circuit directed district courts to consider two questions: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." Duane Reade, 411 F.3d at 389 (citing Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir. 1969)). Moreover, Defendant in its Answer admitted that a "declaration of the parties' rights and obligations under the Policy will serve to resolve the dispute between them." Pl.'s Compl. ¶ 74. See also Def.'s Answer ¶ 74.

by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c); see also CILP Associates, L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (stating that in the event the non-moving party has the burden of proof at trial and the moving party demonstrates a lack of evidence, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.") (citation omitted) (internal quotation marks omitted).

To calculate ACV, the parties have used the formula "[r]epair/[r]eplacement cost with material of like kind and quality – depreciation . . . ." Def.'s Mot. Summ. J. 15 (emphasis omitted); Pl.'s Mot. Part. Summ. J. 19–20. Thus, although ACV is undefined in the Policy, it appears the parties agree on what that term means. Generally, in New York to determine ACV, triers of fact "may consider original cost and cost of reproduction; the opinions upon value given by qualified witnesses; the declarations against interest which may have been made by the assured; the gainful uses to which the buildings might have been put; as well as any other fact reasonably tending to throw light upon the subject." McAnarney v. Newark Fire Ins. Co., 247 N.Y. 176, 184, 159 N.E. 902, 905 (1928) (citations omitted).

First, regarding the "[r]epair/[r]eplacement cost with material of like kind and quality" portion of the ACV calculation, Plaintiff proffers several pieces of evidence including the CTa Loss Assessment Reports, its amended proof of loss, Mr. Des Sullivan's Affidavit, and Mr. Alan Kaplan's expert report to rebut Defendant's argument. Plaintiff argues that CTa Report No. 8 shows that both Plaintiff and Defendant's

replacement cost number for the ACV calculation is greater than $6.2 million. The report provides insight into some of the disagreements that took place between Plaintiff and Defendant and how they affected the adjustment of Plaintiff's claim. It also provides a chart that shows the estimated cost of repair, depreciation using both the Marshall & Swift and Chilean tax code approaches, and Plaintiff's and CTa's respective ACV calculations. Additionally, Plaintiff also points out that Mr. Sullivan's affidavit supports its replacement cost number. It provides in relevant part:

> 6. The $12,104,548 replacement cost estimate includes $2,414,447 for the UNAB Concepcion location that is the subject of a coverage dispute between the parties.
> 7. The $12,104,548 replacement cost estimate also includes $973,937 for the AIEP Concepcion location.

Zieden-Weber Decl. Def.'s Mot. Summ. J. Ex. 35 at ¶¶ 6–7, Jun. 28, 2013, ECF No. 62-43 (emphasis added). Plaintiff argues there is sufficient evidence that replacement cost is greater than $6.2 million. Plaintiff argues that the replacement cost portion of the ACV calculation is a hypothetical number that the parties agree upon well before the actual amount spent on repairs is determined and, thus, the CTa reports sufficiently establish the first portion of the equation. In addition, there are repeated statements in the CTa Loss Assessment Reports that the replacement cost number of $6.2 million and CTa's final damage estimate "was largely due to Laureate's carrying out repairs to an extent that was less than the damages that were actually sustained in the earthquake." Zieden-Weber Decl. Def.'s Mot. Ex. 39 at 4, June 28, 2013, ECF No. 62-56.

Defendant argues that even if this evidence is admissible and passes the threshold for summary judgment on the first part of the equation, "[w]here an insured seeking recovery on an ACV basis offers only evidence of replacement cost or repair cost, the

insurer is entitled to judgment as a matter of law." Def.'s Reply 1, Sept. 16, 2013, ECF No. 76 (citing Incardona v. Home Indem. Co., 60 A.D.2d 749, 750, 400 N.Y.S.2d 944, 945 (N.Y. App. Div. 4th Dep't 1977) ("Replacement cost or cost of repair standing alone is not sufficient proof of actual cash value. The amount for which the insurer may be held liable is the difference between the actual cash value of the property at the time just preceding the fire and the market value immediately after the fire.")). However, unlike the plaintiff insured in Incardona, Plaintiff's evidence does not consist "solely of the cost of repairing the building." Incardona, 60 A.D.2d at 749, 400 N.Y.S.2d at 945. As discussed above, Plaintiff has evidence of both the replacement cost and depreciation, and has designated an expert to discuss whether the depreciation approaches are proper.

Defendant also attacks Plaintiff's method of depreciation. Defendant argues that the Marshall & Swift approach does not account for obsolescence as required by McAnarney. McAnarney defines depreciation as a loss or a fall in value, i.e., "a reduction of worth," which "includes obsolescence." McAnarney, 247 N.Y. at 185, 159 N.E. at 905 (citations omitted) (internal quotation marks omitted). The Marshall & Swift Tables explain that depreciation "is the difference between the market value of a structural improvement . . . and its reproduction or replacement cost as of the date of valuation." See also Zieden-Weber Decl. Def.'s Mot. Ex. 45 at 1, June 28, 2013, ECF No. 62-62. Further, the Marshall & Swift Tables provide that "[t]he overall depreciation tables in this section consider the progression of normal deterioration and obsolescence based on age and condition for the class and usage of the improvement." Zieden-Weber Decl. Def.'s Mot. Ex. 45 at 2. Thus, as a general matter, the Marshall & Swift Tables capture obsolescence, as required by McAnarney.

46

Second, Defendant argues that the Marshall & Swift Tables are inappropriate for properties in Chile.  For this proposition, Defendant cites its deposition of Mr. Alan Kaplan and the Tables themselves.  However, Plaintiff disputes this claim citing its own deposition of Mr. Alan Kaplan.[29]  Defendant notes that Mr. Kaplan was not tasked with determining depreciation or valuation in the first instance.  However, Defendant has not challenged Mr. Kaplan's ability to opine on a proper depreciation method.  Thus, there is sufficient evidence by which a reasonable jury could conclude that the Marshall & Swift approach used by Plaintiff is proper.

Plaintiff argues that it is entitled to summary judgment because the Marshall & Swift approach is proper, and a proper method of depreciation is all that the Policy requires.  Moreover, Plaintiff argues that Defendant has not designated any expert to argue that its proposed method of calculating depreciation pursuant to the Chilean tax code is proper.  The court observes that this back and forth attacking and bolstering of the Marshall & Swift approach should be resolved at trial.  There are triable issues of fact as to whether the Marshall & Swift approach was proper for valuing depreciation in this case.

Thus, the court denies Defendant's motion that Plaintiff is only entitled to its actual repair costs incurred, and its motion that Plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude the ACV of the damaged property is greater

---

[29] For example, Mr. Kaplan testified:

"Q: And what was the substance of your conversation with Mr. Fehribach?

A: . . . And I asked him for his thoughts on whether people use Marshall & Swift in a Latin America market and Chile in particular.

Q: And what did he say?

A: He said yes, they do."  Greeves Decl. Pl.'s Opp'n Ex. NN at 55:9–18, Aug. 31, 2013, ECF No. 71-40.

than $6.2 million.  The court also denies Plaintiff's motion that it is entitled to use the Marshall & Swift depreciation methodology as a matter of law.

**Damages**

In less than a page at the end of its motion for summary judgment, Defendant argues that to the extent any of Plaintiff's arguments have any merit, Defendant is still entitled to judgment as a matter of law because there is no evidence of recoverable damages.  See Pl.'s Mot. Summ. J. 34–35.  Defendant addressed this argument specifically with regards to valuation, which the court has addressed above.  However it has not developed this argument with any particularity in regards to Plaintiff's other counts.   With respect to the remaining issues the court finds that the Plaintiff has met its burden to survive Defendant's motion for summary judgment on Count V.

CONCLUSION

For the reasons stated above, Defendant's Motion to Strike is GRANTED and the court considers the entire email chain, CWS-Curtin00004576 to CWS-Curtin00004609, attached as Exhibit 4 to Defendant's Motion to Strike Exhibit B.  Plaintiff's motion for summary judgment on Count I, the interpretation of the earthquake deductible, is DENIED and Defendant's motion for summary judgment on Count I is GRANTED.  Plaintiff's and Defendant's motions for summary judgment on Count II, calculating the time element portion of the deductible with respect to contract employee payroll, are DENIED. Plaintiff's motion for summary judgment on Count III, coverage of the UNAB Autopista location is GRANTED with respect to business interruption coverage and Defendant's motion for summary judgment on Count III is GRANTED with respect to real property coverage and DENIED with respect to business interruption coverage.  Plaintiff's motion

for summary judgment on Count IV, the valuation of Plaintiff's real property loss, is GRANTED to the extent that Plaintiff is entitled to actual cash value but DENIED with respect to the proper measure of depreciation and Defendant's motion for summary judgment on Count IV is DENIED.  Defendant's motion for summary judgment on Count V, damages, is DENIED.

The Clerk of Court is respectfully directed to close the motions at Dkt. 57, Dkt. 61, and Dkt. 77.

The parties' joint pretrial order and additional submissions required by Rule 5 of the Court's Individual Rules and Practices are due thirty (30) days from the date of this Order.  This case shall be trial ready sixty (60) days from the date of this Order.

The parties are ORDERED to call Case Manager, Steve Taronji to set a telephone conference on or before April 15, 2014.

SO ORDERED.


Dated:  March 31, 2014
        New York, NY


                                    /s/ Claire R. Kelly
                                   Claire R. Kelly, Judge